**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**LATASHA BONET,**
o/b/o **T.B.,**

                          **Plaintiff,**                    **1:11-cv-1140**
                                                            **(GLS)**

              **v.**

**MICHAEL ASTRUE,** Commissioner of
Social Security,
                          **Defendant.**
_____

**APPEARANCES:**                        **OF COUNSEL:**

**FOR THE PLAINTIFF:**
Empire Justice Center               LOUISE MARIE TARANTINO,
119 Washington Avenue               ESQ.
2nd Floor
Albany, NY 12210

**FOR THE DEFENDANT:**
HON. RICHARD S. HARTUNIAN           JEREMY A. LINDEN
United States Attorney              Special Assistant U.S. Attorney
100 South Clinton Street
Syracuse, NY 13261

Mary Ann Sloan
Regional Chief Counsel
Social Security Administration
Office of General Counsel, Region II
26 Federal Plaza, Room 3904
New York, NY 10278

**Gary L. Sharpe**
**Chief Judge**

                    <u>**MEMORANDUM-DECISION AND ORDER**</u>

## I. __Introduction__

Plaintiff Latasha Bonet o/b/o T.B. (TB), challenges the Commissioner of Social Security's denial of Supplemental Security Income (SSI), seeking judicial review under 42 U.S.C. § 1383(c)(3).  (*See* Compl., Dkt. No. 1.) After reviewing the administrative record and carefully considering the arguments, the Commissioner's decision is affirmed and Bonet's Complaint is dismissed.

## II. __Background__

On April 10, 2009, Bonet protectively filed an application for SSI under the Social Security Act ("Act"), alleging disability since March 1, 2009.  (*See* Tr.[1] at 10, 102-09.)  After her application was denied, Bonet requested a hearing before an Administrative Law Judge (ALJ), which was held on November 2, 2010.  (*See id.* at 5-6, 25-53.)  On December 10, 2010, the ALJ issued a decision denying the benefits requested, which became the Commissioner's final decision upon the Social Security Administration Appeals Council's denial of review. (*See id.* at 1-4, 7-24.)

Bonet commenced the present action by filing a Complaint on

---

[1]   Page references preceded by "Tr." refer to the Administrative Transcript in this case.  (*See* Dkt. No. 8.)

September 26, 2011, seeking review of the Commissioner's determination. (*See* Compl.)  The Commissioner filed an answer and a certified copy of the administrative transcript.  (*See* Dkt. Nos. 7-8.)  Each party, seeking judgment on the pleadings, filed a brief.  (*See* Dkt. Nos. 12, 16.)

## III.  Contentions

Bonet contends that the Commissioner's decision is not supported by substantial evidence and was arrived at through the application of incorrect legal standards.  (*See* Dkt. No. 12 at 19-30.)  Specifically, she claims that the ALJ: (1) summarily concluded that TB's impairments did not meet or medically equal a Listing; and (2) incorrectly weighed the evidence in determining that TB's impairments did not functionally equal Listing 112.11.[2]  (*See id.*)  The Commissioner counters that the appropriate legal standards were applied by the ALJ, and that his decision is supported by substantial evidence. (*See generally* Dkt. No. 16.)

## IV.  Facts

The evidence in this case is undisputed and the court adopts the parties' factual recitations.  (*See* Dkt. No. 12 at 1-18; *see generally* Dkt. No. 16 at 1.)

---

[2] 20 C.F.R. pt. 404, subpart P, app. 1, § 112.11.

## V.  Standard of Review and Analysis Framework

The standard for reviewing the Commissioner's final decision under

42 U.S.C. §§ 405(g) and 1383(c)(3) is well established and will not be

repeated here.  For a full discussion of the standard of review, the court

refers the parties to its previous opinion in *Christiana v. Comm'r of Soc.*

*Sec. Admin.*, No. 1:05-CV-932, 2008 WL 759076, at *1-2 (N.D.N.Y. Mar.

19, 2008).

The Social Security Administration has established a three-step

evaluation process by which to determine whether individuals under the

age of 18 are disabled.  *See* 20 C.F.R. § 416.924(a).  The first inquiry is

whether the child is engaging in substantial gainful activity.  *See id.*  If so,

the child is determined not to be disabled, and the inquiry ends.  *See id.*  If

the child is not engaging in substantial gainful activity, the ALJ must

determine whether the child has "an impairment or combination of

impairments that is severe."  *Id.*  An impairment is not severe if it is merely

a "slight abnormality . . . that causes no more than minimal functional

limitations."  *Id.* at § 416.924(c).  If the ALJ concludes that no severe

impairment exists, a determination of non-disability is made, and the

analysis goes no further.  *See id.*  Where a severe impairment or

4

combination of impairments exists, however, the final inquiry is whether the child's impairment or combination of impairments "meets, medically equals, or functionally equals the listings." *Id.* at § 416.924(a).  If the child has such an impairment or combination of impairments, and the duration requirement is met, a finding of disability is made.  *Id.*

## VI.  Discussion

## A.  Listing 112.11

Bonet contends first that TB's impairments meet Listing 112.11 and that the ALJ committed legal error by summarily reaching a contrary conclusion.  (*See* Dkt. No. 12 at 19-23.)  The Commissioner counters, and the court agrees, that remand is inappropriate because the ALJ's listing determination is supported by substantial evidence.  (*See* Dkt. No. 16 at 3-9.)

To meet Listing 112.11, "Attention Deficit Hyperactivity Disorder," a claimant must satisfy both diagnostic and functional criteria: Parts A and B, respectively.  20 C.F.R. pt. 404, subpart P, app. 1, §§ 112.00, 112.11. Satisfaction of Part A requires "[m]edically documented findings of" marked inattention, impulsiveness and hyperactivity.  *Id.* § 112.11.  To satisfy Part B, the findings exhibited in Part A must result in at least two of the

following: "[m]arked impairment in age-appropriate cognitive/communicative function"; "[m]arked impairment in age-appropriate social functioning"; "[m]arked impairment in age-appropriate personal functioning"; and "[m]arked difficulties in maintaining concentration, persistence, or pace." *Id.* §§ 112.02(B)(2)(a)-(d); 112.11.

Here, the ALJ began his listing analysis by noting that the "claimant's representative does not argue that the claimant's impairments meet or medically equal one of the listed impairments." (Tr. at 13.) He nevertheless concluded that "the claimant's impairments are not attended, singly or in combination, with the specific clinical signs and diagnostic findings required to meet or equal the listed impairments," and that "no findings may be substituted for the absent criteria." (*Id.*) Bonet claims that this terse analysis constitutes legal error. (*See* Dkt. No. 12 at 19-23.) A listing determination may be upheld despite "the absence of an express rationale," however, where "portions of the . . . decision and the evidence . . . indicate that [the ALJ's] conclusion was supported by substantial evidence." *Berry v. Schweiker*, 675 F.2d 464, 468 (2d Cir. 1982). As in *Schweiker*, remand is not appropriate here because, despite the brevity of the ALJ's listing analysis, his thorough examination of the evidence

6

elsewhere in the opinion—principally in assessing functional equivalency—provides substantial support for the determination that TB's impairments did not meet or medically equal a listing.

Assuming, *arguendo*, that TB's impairments satisfy Part A of Listing 112.11, substantial evidence supports a finding that they are not sufficiently severe to satisfy Part B.

### 1.    Age-appropriate Social Functioning

While the criteria required to satisfy the domain "interacting and relating to others," is not identical to that necessary to show "[m]arked impairment in age-appropriate social functioning" in Part B, the ALJ's determination that TB was markedly limited in the former, (*see* Tr. at 20-21), suggests that he also suffers marked impairment in the latter. *Compare* 20 C.F.R. § 416.926a(i), *with* 20 C.F.R. pt. 404, subpart P., app. 1, §§ 112.00(C)(2)(b), (3), 112.02(B)(2)(b).

### 2.    Age-appropriate Cognitive/Communicative Function

The ALJ's analysis of TB's ability to acquire and use information is instructive in assessing whether he suffers "[m]arked impairment in age-appropriate cognitive/communicative function."  *Compare* 20 C.F.R. § 416.926a(g), *with* 20 C.F.R. pt. 404, subpart P., app. 1, § 112.00(C)(2)(a),

(3).  "In the preschool years and beyond, cognitive function can be measured by standardized tests of intelligence," with "a valid verbal, performance, or full scale IQ of 70 or less" acting as "[a] primary criterion." 20 C.F.R. pt. 404, subpart P., app. 1, § 112.00(C)(2)(a).

While the ALJ acknowledged TB's early academic struggles, (*see id*. at 18, 181), he pointed to more recent educational records showing considerable improvement as support for a finding of less than marked limitation in the domain of "acquiring and using information," (*id*. at 18).  For example, an Individualized Education Program (IEP) completed in April 2010 indicated that TB was "becoming a fast learner" with the ability to "catch[] on to . . . concepts very quickly."  (*Id*. at 159.)  Furthermore, in a 2009-2010 student progress report, TB's teacher, Jennifer Zindle, described him as "a very smart little boy," who was "able to grasp concepts quickly with little help from teachers."  (*Id.* at 199.)

The ALJ further noted that, on June 3, 2009, TB obtained average scores on a Wechsler Intelligence Scale for Children, Third Edition, with verbal, performance and full scale IQ scores of 90, 103, and 99, respectively.  (Tr. at 18, 225.)  TB also completed a Wechsler Intelligence Scale for Children, Fourth Edition, on August 18, 2009, and received

8

scores above 80 in all areas, with a verbal comprehension score of 95 and a full scale IQ of 84.  (*Id.* at 18, 263.)

As for TB's communicative abilities, although he required the aid of a speech pathologist, (*see id.* at 46, 129, 159), treating psychologist Richard Felch found on July 27, 2009 that his speech was "fluent and articulate," (*id.* at 217).  TB's kindergarten teacher also indicated in June 2009 that, as a familiar listener, she could understand "[a]lmost [a]ll" of his speech on the first attempt.  (*Id.* at 132-33.)

### 3.    *Age-appropriate Personal Functioning*

Similarly to the domain of "caring for yourself,"[3] "[p]ersonal functioning . . . pertains to self-care; i.e., personal needs, health and safety," and "is measured in terms of the child's increasing ability to help himself . . . and to cooperate with others in taking care of these needs." 20 C.F.R. pt. 404, subpart P, app. 1, § 112.00(C)(2)(c).  Impairment in the area of personal functioning "is manifested by failure to develop such skills, failure to use them, or self-injurious actions."  *Id.*

As the ALJ acknowledged in his functional equivalency analysis, TB

---

[3] *Compare* 20 C.F.R. § 416.926a(k), *with* 20 C.F.R. pt. 404, subpart P., app. 1, § 112.00(C)(2)(c), (3).

has "a difficult time satisfying his emotional needs in appropriate ways," as evidenced by his "history of engaging in unsafe behaviors, such as playing with fire." (Tr. at 23.)  Additionally, TB's kindergarten teacher indicated that he had a very serious problem "[u]sing good judgment regarding personal safety and dangerous circumstances," and his mother testified that he brought a knife on the school bus, shoplifted, and displayed a lack of caution in high-traffic areas. (*Id.* at 32-34, 48, 50, 134.)

In determining that TB had less than marked limitation in caring for himself, however, the ALJ pointed to TB's 2010-2011 IEP, which indicated that when he "is not engaging in unsafe behavior, he is very polite and respects his Teacher and staff members," and that he "likes to use the classroom's 'vacation spot' for a quiet place to be calm and regroup." (*Id.* at 23, 160-61.)  The ALJ also noted that, in an August 2009 progress note, psychiatrist Christopher Burky opined that TB was "more aware of," and was willing to apologize for, "his behaviors." (*Id.* at 23, 271.)  In a 2009-2010 student progress report, Zindle indicated that TB demonstrated satisfactory awareness of health and safety practices. (*See id.* at 200.) While TB initiated a fire in late 2008 or early 2009 that resulted in the loss of his family's home, a fire assessment concluded that he lacked intent and

that the blaze resulted from a lack of supervision.  (*See id.* at 255.)

Additionally, TB was "toilet trained by [three] years old," (*id.* at 262), able to brush his teeth and dress himself with no help as early as four years old, (*see id.* at 248), and his hygiene was consistently noted as appropriate, (*see, e.g.*, *id.* at 251, 255, 271).  Although Bonet testified that TB suffered persistent sleep disruptions, (*see id.* at 40-41), Dr. Burky indicated in August 2009 that Clonidine was working well to correct those issues, and Dr. Felch offered the same opinion one year later, (*see id.* at 235, 271).

### 4.   Concentration, Persistence or Pace

The final consideration in Part B of Listing 112.11 requires an assessment of whether a claimant has marked "deficiencies of concentration, persistence, or pace resulting in frequent failure to complete tasks in a timely manner."  20 C.F.R. pt. 404, subpart P., app. 1, § 112.00(C)(2).  This inquiry largely mirrors that undertaken in the domain of "attending and completing tasks,"[4] and "may be measured through observations of the child in the course of standardized testing and in the

---

[4]  *Compare* 20 C.F.R. § 416.926a(h), *with* 20 C.F.R. pt. 404, subpart P., app. 1, §§ 112.00(C)(2)(d), (3).

course of play." *Id.* § 112.00(C)(2)(d).

In finding that TB had less than marked limitation in his ability to attend and complete tasks, the ALJ noted evidence indicating that he "requires medication and a structured environment to help with impulsivity, hyperactivity, inattentiveness, and distractibility." (Tr. at 19, 161.) While administering an IQ test to him, examining consultative psychologist Annette Payne found TB to be "cooperative, but excessively silly." (*Id.* at 262.) In a February 2010 teacher questionnaire, social worker Mark Clemons and Zindle indicated that TB suffered from a number of "serious problem[s]" in the domain of "attending and completing tasks," and commented that while "[m]edication helps him focus and attend, . . . he still has difficulty following directions and can be very disruptive." (*Id.* at 149.) As discussed below, however, this opinion was permissibly accorded little weight by the ALJ. (*See id.* at 16.)

In support of his determination of less than marked limitation, the ALJ focused on TB's improvement in this area when on medication. (*See id.* at 19.) In June 2009, TB's kindergarten teacher, Sue Butler, indicated that he suffered only "slight problem[s]" in this area. (*Id.* at 131.) That same month, school psychologist Julie Guarino observed TB in the classroom

and found him to be "attentive and on task during . . . one on one

instruction." (*Id.* at 223.)  TB's 2010-2011 IEP noted that when "motivated

and engaged in a school lesson or activity, he will sit at his seat and

participate." (*Id.* at 159.)  It also indicated that TB enjoyed "putting puzzles

together," as well as "listen[ing] to stories and . . . figur[ing] out what will

happen at the end." (*Id.* at 159, 161.)  "Treatment [p]lanning [m]eeting"

notes from January 2010 described TB as largely "stable and available for

learning," and stated that he began "most days . . . well by sitting and

completing his work very calmly," and was "then able to follow the routine

of the day quite well." (*Id.* at 203.)

While the ALJ did not explicitly assess TB's limitations under the

framework of Listing 112.11, his functional equivalency analysis and the

evidence of record support an inference that TB's only marked impairment

under Part B existed in the area of age-appropriate social functioning.

Accordingly, despite the brevity of his analysis, the ALJ's determination that

TB did not meet or medically equal Listing 112.11 is supported by

substantial evidence, and is therefore affirmed.

**B.**   **Credibility Determination**

Bonet argues next that the ALJ discounted the credibility of her

13

testimony in an impermissibly cursory fashion.  (*See* Dkt. No. 12 at 25.)

While the Commissioner fails to address this contention directly, the ALJ

properly assessed all relevant factors in discounting Bonet's credibility.

Once an ALJ determines that the claimant suffers from a "'medically

determinable impairment[] that could reasonably be expected to produce'

the [symptoms] alleged," he "must evaluate the intensity and persistence of

those symptoms considering all of the available evidence; and, to the

extent that the claimant's [subjective] contentions are not substantiated by

the objective medical evidence, the ALJ must engage in a credibility

inquiry." *Meadors v. Astrue*, 370 F. App'x 179, 183-84 (2d Cir. 2010)

(quoting 20 C.F.R. § 404.1529(c)(1), (c)(3)(i)-(vii)).  In performing this

analysis, the ALJ "must consider the entire case record and give specific

reasons for the weight given to the [claimant's] statements."  SSR 96-7p,

1996 WL 374186, at *4 (July 2, 1996).  Specifically, in addition to the

objective medical evidence, the ALJ must consider the following factors: "1)

daily activities; 2) location, duration, frequency, and intensity of any

symptoms; 3) precipitating and aggravating factors; 4) type, dosage,

effectiveness, and side effects of any medications taken; 5) other treatment

received; and 6) other measures taken to relieve symptoms."  *F.S. v.*

*Astrue*, No. 1:10-CV-444, 2012 WL 514944, at *19 (N.D.N.Y. Feb. 15, 2012) (citing 20 C.F.R. § 404.1529(c)(3)(i)-(vi)).

After summarizing Bonet's contentions regarding the intensity, persistence and limiting effects of TB's symptoms, (*see* Tr. at 16), the ALJ thoroughly analyzed the objective and subjective record evidence—including psychiatric treatment notes, educational reports and teacher opinions—which he found to contradict her claims, (*see id.* at 16-17).  The ALJ specifically addressed TB's social progression,  the frequency and intensity of his behavioral episodes, the effectiveness of his medication, and the ability of his babysitter to manage his behavior.  (*See id.*)  Accordingly, Bonet's characterization of the ALJ's credibility analysis as "'boilerplate,'" (Dkt. No. 12 at 25), is unfounded, and the ALJ's determination is supported by substantial evidence.

**C.    Weight of Opinion Evidence**

    *1.    Examining Consultative Psychologist*

Next, Bonet argues that the ALJ erred in according "little weight" to the opinion of examining consultative psychologist Payne.  (Dkt. No. 12 at 25-26; Tr. at 16.)  The Commissioner counters, and the court agrees, that the ALJ permissibly discounted the weight assigned to Dr. Payne's

findings.  (*See* Dkt. No. 16 at 11-12.)

Under the regulations, the findings of psychologists are treated as "medical opinions."  20 C.F.R. § 416.927(a)(2).  Unless controlling weight is given to a treating source's opinion, the ALJ is required to consider the following factors in determining the weight assigned to a medical opinion: whether or not the source examined the claimant; the existence, length and nature of a treatment relationship; the frequency of examination; evidentiary support offered; consistency with the record as a whole; and specialization of the examiner.  *See id.* § 416.927(c).

On August 18, 2009, following a consultative examination of TB and receipt of information from Bonet, Dr. Payne found that TB suffered "significant" difficulties in all areas of functioning.  (Tr. at 261-65.)  The ALJ accorded Dr. Payne's opinion "little weight," citing as support the vagueness of her statements, a lack of specificity as to "the degree to which she considers [TB]'s limitations to be 'significant[,]' . . . inconsistenc[y] with the totality of the evidence," and an apparent overstatement of TB's limitations.  (*Id.* at 16.)  Immediately following his assessment of Dr. Payne's opinion, and in the subsequent functional equivalency analysis, the ALJ articulated with greater specificity the record

evidence supporting a finding of less severe impairment than that offered by Dr. Payne.  (*See id.* at 16-24.)  Because the ALJ considered the relevant factors and properly explained his reasoning for discounting the weight accorded to Dr. Payne's opinion, his decision to do so will not be disturbed.

> 2.    *Social Worker and Teacher Questionnaire*

Bonet contends next that the ALJ improperly accorded little weight to the opinions of social worker Clemons and teacher Zindle.  (*See* Dkt. No. 12 at 26-28.)  The Commissioner counters, and the court agrees, that the ALJ's assignment of weight is supported by substantial evidence.  (*See* Dkt. No. 16 at 11-17.)

While information obtained from school teachers and social workers cannot establish the existence of an impairment, it "may provide insight into the severity of the impairment and how it affects the individual's ability to function."  *Cohn ex rel. R.Y. v. Astrue*, No. 10-CV-214, 2012 WL 1068824, at *2 (N.D.N.Y. Mar. 29, 2012) (citing SSR 06-03p, 2006 WL 2329939, at *4 (Aug. 9, 2006)).  Although "[n]ot every factor for weighing opinion evidence will apply in every case," the following considerations can be used to evaluate evidence received from "other sources," such as teachers

and social workers, the: length of the relationship; consistency with other record evidence; extent of supporting evidence; cogency of the source's explanation; and expertise of the source.  SSR 06-03p, 2006 WL 2329939, at *4-5.

In a February 2010 teacher questionnaire, Clemons and Zindle opined that TB had "serious" or "very serious" problems acquiring and using information, attending and completing tasks, interacting and relating with others, and caring for himself.  (Tr. at 147-154.)  The ALJ accorded "little weight" to this report, however, noting that it was inconsistent with "the totality of the evidence," including "narrative reports from St. Catherine's, . . . other teacher opinions," and TB's 2009-2010 report card. (*Id.* at 16-17.)

Bonet disputes the ALJ's reliance on TB's report card—in which Zindle indicated, contrary to the questionnaire, that TB was making "satisfactory" progress in a number of academic areas, and opined that he was "a very smart little boy," and "continues to make academic achievements in school," (*id.* at 199-200)—on the grounds that the ALJ failed to appreciate that the progress noted occurred because of a structured classroom setting, (*see* Dkt. No. 12 at 26-27).  While Bonet is

correct that the ALJ has an obligation to consider a claimant's "need for a structured setting and the degree of limitation in functioning [he has] or would have outside the structured setting," 20 C.F.R. § 416.924a(b)(5)(iv)(C), her claim that the ALJ failed to do so is without merit. In fact, the ALJ twice discussed TB's need for a structured setting, including in assessing his ability to attend and complete tasks.  (*See* Tr. at 15, 19.)  Bonet also argues that the ALJ's reliance on a 2009 teacher questionnaire completed by TB's kindergarten teacher was improper.  (*See* Dkt. No. 12 at 27-28.)  Where the ALJ is faced with reports that are at odds with one another, however, "it [is] well within [his] realm to resolve" such conflicts.  *Lopez ex rel. L.J.L. v. Comm'r of Soc. Sec.*, No. 11 Civ. 5792, 2012 WL 2497275, at *6 (S.D.N.Y. June 25, 2012).

Because the ALJ's assignment of weight to the opinions expressed in Clemons and Zindle's questionnaire contained no legal error, and is supported by substantial evidence, it is affirmed.

*3.    Non-examining State Agency Consultative Psychologist*

Finally, while Bonet does not dispute the moderate weight given to the opinion of non-examining consultative state agency psychologist H. Ferrin, she argues that the ALJ erred in failing to adopt, without

explanation, Dr. Ferrin's "finding of a marked limitation in attending and completing tasks."[5]  (Dkt. No. 12 at 28.)  The Commissioner contends that the ALJ's divergence from Dr. Ferrin's findings was sufficiently explained and is supported by substantial evidence.  (*See* Dkt. No. 16 at 17-18.)  The court agrees with the Commissioner.

Although state agency psychological consultants are "highly qualified . . . experts in Social Security disability evaluation," their findings do not bind the ALJ.  20 C.F.R. § 416.927(e)(2)(i).  In assessing the findings of a state agency psychological consultant, the ALJ is required to consider relevant factors, "such as the consultant's medical specialty and expertise in [Social Security] rules, the supporting evidence in the case record, [and] supporting explanations" provided.  *Id.* § 416.927(e)(2)(ii).

In an October 6, 2009 review, Dr. Ferrin opined that TB suffered marked limitation in "attending and completing tasks," less than marked limitation in "acquiring and using information" and "interacting and relating with others," and no limitation in the remaining domains.  (Tr. at 281-82.)

_____

[5] It should be noted that, because he found marked impairment in only one domain, (*see* Tr. at 279-82), wholesale adoption of Dr. Ferrin's findings would also result in a finding that TB's impairments fail to functionally equal a listing.

While the ALJ gave Dr. Ferrin's opinion "moderate weight," he diverged in his functional analysis in light of "new evidence received at the hearing level." (*Id.* at 17.)  Specifically, the ALJ found TB to have marked limitation in "interacting and relating with others," and less than marked limitation in "attending and completing tasks." (*See id.* at 18-21.)  Included in the "new evidence received at the hearing level" referenced by the ALJ, (*id.* at 17), were educational reports and plans, discipline reports, treatment plans, psychological assessments, and a social history and behavior analysis, (*see id.* at 157-228).  While the ALJ mentioned this evidence only briefly in the paragraph referenced by Bonet, he cited it extensively in the analysis sections of his decision.  (*See id.* at 15-24.)  As discussed above in Section B, substantial evidence supports the ALJ's determination that TB suffered less than marked limitation in "attending and completing tasks." Accordingly, the ALJ sufficiently explained his reasoning for diverging from Dr. Ferrin's functional analysis, and his decision to do so is supported by substantial evidence.

**D.    Disputed Domains**

Lastly, Bonet contends that TB suffers marked limitation in the

domains "attending and completing tasks" and "caring for yourself."[6]  (*See* Dkt. No. 12 at 28-30.)  For the reasons discussed at length above in Section B, however, the ALJ's determination that TB suffered less than marked limitation in those domains is supported by substantial evidence and will not be disturbed.

**E.**     **Remaining Findings and Conclusions**

After careful review of the record, the court affirms the remainder of the ALJ's decision as it is supported by substantial evidence.

## VII. Conclusion

**WHEREFORE**, for the foregoing reasons, it is hereby

**ORDERED** that the decision of the Commissioner is **AFFIRMED** and Bonet's Complaint (Dkt. No. 1) is **DISMISSED**; and it is further

**ORDERED** that the Clerk close this case and provide a copy of this Memorandum-Decision and Order to the parties.

---

[6] Citing the questionnaire completed by Clemons and Zindle, Bonet argues in a footnote that "the ALJ should have found that [TB] had an "'extreme'" limitation in interacting and relating with others."  (Dkt. No. 12 at 24 n.24.)  As discussed in Section C, however, the ALJ permissibly accorded "little weight" to this questionnaire, and the ALJ's finding of marked limitation in the domain "interacting and relating with others" is supported by substantial evidence.

**IT IS SO ORDERED.**

August 16, 2012
Albany, New York

Gary L. Sharpe
Chief Judge
U.S. District Court